This appeal involves the ownership, of 41 2/3 shares of the capital stock of Supreme Industrial Life Insurance Company, Inc., an industrial life insurance company created under the laws of this state in 1941 and having its domicile in New Orleans. All of the stockholders in the said company are colored persons.
The capitalization of the corporation is one thousand shares of stock having a par value of $10 per share. At the time of the transaction hereinafter discussed, the stock was equally, or about equally, divided between six persons, namely: Raleigh J. Coker, Frank J. Walker, Lucien V. Alexis, Sr., Paul Hortman, Gustave C. Chapital, Jr., and Horace Rixner. Each of the parties had a few shares of stock placed in the names of a member or members of his respective family, in order to qualify them for eligibility to the board of directors of the corporation.
On or about September 13, 1944, Paul Hortman and his wife, who owned 166 2/3 shares of stock, notified the corporation through its secretary that they wished to sell their stock, and they offered it to the other stockholders in proportion to their then present holdings, in accordance with the provisions of the charter of the corporation, which provides in article 4 that no stock shall be sold or transferred without it first being offered at not more than its book value to the stockholders of the corporation for a period of not less than thirty days, and that such offer shall be made in writing addressed to the corporation and delivered to the secretary, who shall communicate said offer in writing to each stockholder of record at the time of the offer.
On September 19, 1944, Coker and his foster daughter, Walker and his wife, Alexis and his wife, Chapital and his wife and daughter, and Rixner and his wife, in writing, gave notice to the corporation that they desired to purchase the Hortman stock in accordance with article 4 of the charter, and signed what is termed a "subscription list."
On December 23, 1946, Chapital brought this present suit against the corporation, *Page 902 
Walker, Alexis and Coker to compel them to deliver to him his proportionate share of the Hortman stock which he had contracted to purchase, alleging that he is entitled to receive 41 2/3 shares, and that although he has been always ready, willing and able to pay for his part of the Hortman stock and has repeatedly demanded that it he delivered to him he has never received it. He further alleged that Walker, Alexis and Coker transferred the Hortman stock to themselves with the full knowledge that the 41 2/3 shares were under contract to be sold to him.
Plaintiff sought a judgment ordering Walker, Alexis and Coker each to sell unto him 13 16/18 shares of stock, and ordering the corporation to transfer such stock to him on its books and to deliver the proper stock certificate or certificates evidencing the same, upon plaintiff depositing in the registry of the court the sum of $416.77, the value of the said stock. An injunction was also sought prohibiting and enjoining the defendant Supreme Industrial Life Insurance Company, Inc., from holding the regular annual meeting of the stockholders fixed for January 7, 1947, or any other meetings of the stockholders, until the further orders of the court.
The corporation, Walker and Coker make the defense that Chapital withdrew his offer to purchase his part of the Hortman stock, and that he even offered his own stock for sale by letter written on October 13, 1944; that after the withdrawal of the offer to purchase by plaintiff, Walker, Alexis and Coker paid for and acquired the Hortman stock; that new certificates were issued to them or their nominees on October 30, 1944, and that these certificates were signed by plaintiff as treasurer of the corporation. These defendants further allege that since such time they have continued to hold the stock and have voted the same at regular meetings of the stockholders held in January 1945 and 1946, and at a special meeting in December 1945, at all of which meetings plaintiff was present and voted his own stock, making no objection to defendants voting their respective portions of the Hortman stock. The further defense is made that Chapital has waived his right to acquire any part of the Hortman stock and is estopped, after two years of inaction, from demanding that the defendants, who had put up their money to acquire the said stock in October 1944, must now allow him to participate therein.
Defendant Alexis, in his answer, practically admitted all of the allegations of the petition, and prayed that there be judgment in favor of plaintiff.
Upon the trial of the rule nisi for a preliminary injunction, the trial court restrained and prohibited the defendants from holding any stockholders' meetings until the further orders of the court. A devolutive appeal from this decree was taken by all defendants except Alexis, which appeal was heard before us, and the preliminary injunction was recalled. See 30 So.2d 150, and 32 So.2d 90. We remanded the cause to the Civil District Court for the Parish of Orleans for further proceedings on the merits, not inconsistent with the views expressed by us.
The matter was tried on its merits in the court below and plaintiff recovered judgment as prayed for. The corporation, Walker and Coker have appealed.
Rixner, one of the stockholders, sold his stock subsequent to the Hortman transaction, and at this time there are only four persons, together with their nominees, owning stock in the corporation. As will be seen from the above, they are divided into two camps, Walker and Coker on the one side, and Alexis and Chapital on the other. The control of the corporation is incidentally involved in this case, for if the plaintiff is not to be allowed to obtain the 41 2/3 shares, the Walker-Coker fraction will hold sway and Alexis and Chapital and their nominees will be in the minority.
Our concern in this case is largely with facts. We note that the trial in the court below was clothed with much bitterness, and the record is stamped with acrimony and shows that truth was handled loosely. The testimony of the two factions is diametrically opposed on salient questions.
[1] Chapital's testimony is to the effect that he was always ready and willing to take title to his share of the Hortman stock and that he repeatedly made that fact known to the officers of the company, *Page 903 
and always insisted upon the delivery of the stock to him. In this he is supported by the defendant Alexis. Chapital stated that Coker and Walker had always led him to believe that he would ultimately get his stock, and that it was only when Walker flatly refused to transfer the stock that he sought redress from the courts. On the other hand Walker and Coker vehemently denied that Chapital ever made demand for the stock, but on the contrary, they say, Chapital stated to them he did not want to go through with his deal to purchase a proportionate share of it.
There was offered and admitted in evidence a carbon copy of a letter bearing the date October 6, 1944, addressed by Coker as president of the company to Walker, instructing him to interview Chapital, and to take with him a witness, in order to definitely learn whether Chapital and his nominees planned to make good their agreement to purchase his share of the Hortman stock. Walker claims that upon receipt of this letter from the president he, together with Alexis, visited Chapital, and that Chapital informed him, in the presence of Alexis, that he, Chapital did not want any part of the Hortman stock, and even contemplated offering his own stock for sale to the other stockholders. In order to bolster this contention that Chapital had stated he did not want any of the Hortman stock, the defense introduced into evidence a carbon copy of a letter purportedly written by Walker on October 10, 1944, and addressed to Coker, in which Walker informed the president of the company that he, together with Alexis, had interviewed Chapital and that Chapital had unequivocally stated that "he had no intention of giving any money in the form of currency or check for the purchase of the stock of Hortman et al," and that Chapital had stated he intended to offer his stock for sale.
There was much made of the copy of the above mentioned letter, and Walker stated that it was written shortly after his visit with Alexis to see Chapital, and that the facts stated in the letter were correct. He claimed that Alexis dictated the letter and that he, Walker, signed it and sent it to Coker. But Alexis denied that he dictated the letter, although he admitted going with Walker to see Chapital, and his testimony is that he did not hear the conversation which took place between them.
Dorothy Wiltz, who was a stenographer for the Supreme Industrial Life Insurance Company, Inc., testified that she wrote the letter from the dictation of Alexis, but a careful reading of her testimony leads us to the conclusion that little weight should be accredited to it, for Chapital and a disinterested witness testified that previously, when they spoke to the Wiltz woman about the letter, she denied that she had written it and disclaimed any knowledge of it.
Plaintiff's counsel called for the original of the letter and Walker stated to the court "Your Honor, I will find it; I will, your Honor," but he apparently never found it, because we cannot locate it in the record. The nonproduction of the original is an extremely suspicious circumstance; the letter was a matter of much importance to the defendants, and it would seem that great care would have been taken to preserve the original.
Both Alexis and Chapital admit that Walker did call to see Chapital on the mentioned occasion, but they state that at the conference there had been no discussion about the Hortman stock whatever, and that the purpose of Walker's visit was to ascertain if Chapital, as a stockholder, would help to "fortify the capital structure" as the treasury of the corporation was impaired at the time.
Our conclusion is that the testimony of Chapital regarding Walker's visit to him seems to be the most probable, because the record shows that during October 1944 Chapital did make a contribution of some $1,167 to the corporation's treasury, and in March 1945 he contributed another $1,000. It seems that Coker, Walker and Alexis also made like contributions at the times mentioned, as the Secretary of State and ex-officio Insurance Commissioner demanded that the treasury be strengthened, otherwise the corporation could continue with its business no further.
The trial judge, in view of the contributions made by Chapital, concluded that it would be unreasonable to believe that a *Page 904 
person who had contributed more than $2,100 to the treasury intended to relinquish his stock holdings in this closed corporation and place himself at the mercy of his adversaries, particularly in view of the fact that it would have taken only an advance of $416.77 by Chapital to acquire his share of the Hortman stock. In his written reasons for judgment the trial court made these observations: "* * * it does not take an immensity of common sense, and it would be contrary to all laws of human nature for a man to go into a joint enterprise with three other individuals, to contribute with them in equal proportions money to replenish capital stock illegally depleted the sum of over $1100.00, and then to make another contribution of one thousand dollars at a later date, and if he in their joint undertaking to pay themselves back for this money advanced to the corporation received the sum of $50.00 per week, and to knowingly or willingly place in their hands the power to destroy him and to divest him of all rights he may have to the profits of the corporation."
In order to offset the effect of the Chapital contributions, learned counsel for defendants argue that the donations of cash to the corporation were to continue it in business so that the plaintiff and defendants could derive an income from the corporation, for up to that time it had never paid a dividend. Counsel point out that immediately after the first donation was made the four parties began receiving "salaries" of $50 a week and each continued to receive that salary for two years, or until October 1946. We believe counsel's contention has been fully answered by the trial judge.
[2, 3] Counsel for defendants likewise seek to make capital of the fact that when the Hortman stock was placed in the names of Coker, Walker and Alexis, plaintiff signed the certificates as treasurer of the company. It is sought to be impressed upon us that such action on the part of Chapital amounted to an estoppel against him from claiming any part of the stock. Chapital testified that Walker was the man who had blocked him from getting his stock, and that he repeatedly spoke to Coker about it. Asked why he did not take the matter up with Walker, Chapital stated that he was afraid to go to Walker, because at a directors meeting during 1943 or the early part of 1944 Walker had a pistol with him and made the statement that if anything passed in the meeting that he did not like he would kill some one. Chapital stated that when Coker and Walker demanded that the Hortman stock be placed in the three names, he, because of his fear of Walker, signed the new stock certificates as treasurer of the corporation; that Coker and Walker at the time promised him he would get his share of the stock at some later date. He explained that Coker and Walker wanted to "punish" him and that "they was soaking me in my own grease and after I soaked in my own grease long enough they would give me the stock."
At the commencement of Chapital's testimony that he signed the certificates under duress, counsel for the defense objected to the admission of the testimony upon the ground that there was no allegation to that effect, nor was it alleged that the defendants had promised to later let Chapital have a part of the stock. The objection was overruled by the trial court and the evidence was permitted to be introduced. Counsel complains of this ruling, but we find no error, because it is well settled that allegations of an answer are open to any objections of law or fact without any special plea, and replications are not required or permissible under our law. When defendants pointed to Chapital's signing of the certificates as one of their defenses, Chapital had the right to explain the circumstances under which he signed the certificates without the necessity of having pleaded the facts regarding the matter.
[4] Horace Rixner, the fifth stockholder at the time of the Hortman transaction, later sold his holdings to the four remaining stockholders, and Chapital received his part of the Rixner stock. Chapital stated that at the time of the Rixner transaction he contended to the three other stockholders that in view of his not having received his share of the Hortman stock he, in fairness, should be given a larger share of the Rixner stock to make up for *Page 905 
it, but Walker told him that he would not get any extra stock out of the Rixner lot.
The defense counsel confidently direct our attention to the above testimony, claiming that it indicates Chapital's intention of abandoning any right he may have had to get any of the Hortman stock, but we cannot attach this import to the testimony. Chapital was always disgruntled about having been deprived of the Hortman stock and had repeatedly demanded it from the defendants, but received from them, instead of stock, merely promises, and we believe that it was a normal human reaction for him to request additional shares of the Rixner stock to make up for his part of the Hortman stock which he had been promised by the other three stockholders. Chapital's demand for additional shares of the Rixner stock did not have the effect of constituting an abandonment on his part of his hope to get that part of the Hortman stock to which he believed he was entitled.
The defense also contends that the record shows that at certain stockholders meetings Coker, Walker and Alexis voted the Hortman stock, and that plaintiff, who was present and voted his own stock, made no objection to the Hortman stock being voted by the others. This defense is not borne out by the evidence, from which it appears that Chapital did make the point at a meeting of the stockholders that he should be permitted to vote his part of the Hortman stock.
As we said at the outset, there was much bitterness between the parties, and Coker, in an attempt to strike out at Alexis, who had joined the Chapital camp, made an admission which we believe was most damaging to the defendants' cause. He was asked if he had ever promised to let Chapital have any of the stock, and his answer, quoted in full, is as follows: "No, there is no credence in that. The Chapital stock was discussed by the three of us, between Walker, Alexis and myself, and Professor Alexis was the man said don't give him anything; he was the man; he started all that by refusing to give him his share of the stock."
The above testimony of Coker evidently made a deep impression upon the trial judge, for we find that he himself then questioned the witness. He prodded Coker regarding the admission which the witness had made, and the most he could get from Coker, who could not extricate himself, was that two years ago Chapital was entitled to the stock but that Coker believed he was not entitled to it now "because that time has elapsed."
[5, 6] The reasons given by the trial judge clearly and unmistakably indicate that he believed the testimony of Chapital and Alexis should prevail over that of Coker and Walker. He had the opportunity of seeing the witnesses, noting their demeanor, and hearing them testify, and under the familiar rule of law the findings of the trial court on facts should not be disturbed unless manifestly erroneous. Not only do we detect no error in the findings, but we deem them eminently correct, as our careful reading of the record likewise firmly leads us to the belief that the testimony of Chapital and Alexis is by far the worthier.
[7] Coker and Walker, in this court, filed a plea of prescription of one year under C.C. art. 3536, contending that the present action arises from a fraudulent act and should have been instituted within one year of plaintiff's discovery or knowledge of such fraud. Counsel argues that the Rixner transaction took place "a little while after" the Hortman stock was sold, and that the suit was filed by the plaintiff more than two years after the Rixner deal when Walker told Chapital that he would get no part of the Hortman stock. We fail to see how the prescription of one year is applicable to the present case. It is true that the defendants have been charged by the plaintiff with bad faith, but the action is not pitched upon the ground that defendants fraudulently took away the stock from plaintiff, but rather that plaintiff is entitled to it by virtue of his having contracted to purchase it. Defendants' brief even concedes this, for it is therein stated "that Plaintiff predicated his cause of action solely on the terms of the corporation's charter regarding the division among existing stockholders of stock offered for sale," and the action is defended upon the ground that plaintiff waived his *Page 906 
rights to Hortman's stock. The one year prescription is certainly not applicable.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.